# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

**Kenneth Earl Daniels, Sr.**                          Civ. No. 12-407 (PAM/AJB)

        Plaintiff,

                                         **REPORT AND RECOMMENDATION**

**v.**

**Michael J. Astrue,**

**Commissioner of Social Security**,

        Defendant.

_____

Stephen J. Beseres and Eddy Pierre Pierre, Esqs., Law Offices - Harry J. Binder and Charles C. Binder, P.C., 4124 Quebec Ave. N, Suite 303, New Hope, MN 55427, for Plaintiff.

David W. Fuller, Asst. United States Attorney, 600 United States Courthouse, 300 South 4th Street, Minneapolis, MN 55415, for the Commissioner.

_____

ARTHUR J. BOYLAN, United States Chief Magistrate Judge

The matter is before this Court, United States Chief Magistrate Judge Arthur J. Boylan, for a report and recommendation to the District Court on the parties' cross-motions for summary judgment. *See* 28 U.S.C. § 636(b)(1) and Local Rule 72.1. This Court has jurisdiction under 42 U.S.C. § 405(g). Based on the reasoning set forth below, this Court recommends that Plaintiff's motion for summary judgment [Docket No. 7] be denied and Defendant's motion for summary judgment [Docket No. 13] be granted.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

## A.    Procedural History

Plaintiff Kenneth Earl Daniels, Sr. ("Daniels") filed applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI") on October 19, 2006, alleging disability

beginning October 10, 2004, based on mental illness. (Tr. 161-170, 236.)[1]  His applications were

denied initially and upon reconsideration. (Tr. 82-92, 102-107.) Daniels requested a hearing before

an administrative law judge, and the hearing was held on March 25, 2010, before Administrative

Law ("ALJ") William G. Brown. (Tr. 109-10, 49-72.) The ALJ issued an unfavorable decision on

June 18, 2010. (Tr. 26-28.) On December 22, 2011, the Appeals Council denied Daniels' request

for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.

(Tr. 1-7.) *See* 20 C.F.R. §§ 404.981, 416.1481. On February 16, 2012, Daniels sought review from

this Court. The parties then filed cross-motions for summary judgment.

## B.    Factual Background

On August 9, 2004, Daniels underwent a mental health admission screening by the

Minnesota Department of Corrections upon imprisonment for robbery. (Tr. 336, 333.) Daniels

denied all symptoms of mental illness other than chemical abuse. (*Id.*) The only abnormal finding

in his mental status examination was an irritable mood. (*Id.*) In November 2004, Daniels was

transferred to the Minnesota Correctional Facility in St. Cloud ("MCF-St. Cloud") after threatening

to hurt himself. (Tr. 334.) He had been started on Paxil the previous week, and subsequently

switched to Cymbalta and Trazadone. (*Id.*) He then felt much better and was no longer suicidal.

(*Id.*)

In February 2005, Daniels, still in prison, began counseling. (Tr. 333.) He was diagnosed

---

[1] The Court will cite the Administrative Record in this matter, Docket No. 6, as "Tr."

with dysthymic disorder, polysubstance dependence, antisocial personality traits, and assessed a GAF score of 55-60.[2]  (*Id.*)  Daniels was next evaluated by Dr. Ashley Sovereign and licensed psychologist Jon Penton on March 18, 2005, after he was transferred to MCF-Faribault ("FRB"). (*Id.* at 331-32.)  Daniels said his only mental health treatment outside prison was taking Zoloft for one month after his mother died.  (Tr. 331.)  He also underwent four chemical dependency treatments, and was now sober for nine months.  (*Id.*)  He was presently taking Prozac.  (*Id.*) Daniels said his suicidal ideation came and went.  (*Id.*)  He suffered poor sleep, no energy, no interest in activities, excessive appetite, weight gain, irritable mood, and anger control problems. (*Id.*)  Objectively, he had a blunt and tearful affect, psychomotor retarding, and was drawn and fatigued.  (*Id.*) He was diagnosed with major depressive disorder, cocaine and cannabis dependence, and a GAF score between 41-50.[3]  (*Id.*)

Dr. John Kluznik evaluated Daniels on April 8, 2005.  (Tr. 330.)  Daniels was due to be released in June 2006.  (*Id.*)  His complaints were poor sleep, irritability, paranoia, and hearing voices when angry.  (*Id.*)  On examination, he seemed cheerful but cautious or weary.  (*Id.*)  His behavior did not indicate a psychosis.  (*Id.*)  Dr. Kluznik prescribed Prozac and nortriptyline. (*Id.*) Six weeks later, Daniels said his depression was unrelenting, and his medications caused constipation.  (Tr. 328.)  He had suicidal thoughts without a plan.  (*Id.*)  Three of his cousins had committed suicide, and there was a strong family history of drug addiction.  (*Id.*)  His sleep was

---

[2] The Global Assessment of Functioning ("GAF") scale, a scale of 0 to 100, is used by clinicians to subjectively rate a client's overall social, psychological, and occupational functioning. *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV-tr") 32 (American Psychiatric Association 4th ed. text revision 2000).

[3] GAF scores between 41-50 indicate serious symptoms or any serious impairment in social, occupational, or school functioning.  *DSM-IV-tr* at 34.

poor. (*Id.*) The voices in his head, telling him to fight with other inmates, would not leave him alone. (*Id.*) Dr. Kluznik did not believe Daniels was currently at high risk for suicide. (*Id.*) He increased Prozac and restarted Trazadone. (*Id.*)

When Daniels saw Dr. Sovereign on June 6, 2005, he was doing much better, although his sleep was disturbed, and anger issues continued. (Tr. 327.) Apart from depression and irritability, his mental status was normal, and he did not appear to be responding to internal stimuli. (*Id.*) Dr. Sovereign assessed a GAF score between 41-50. (*Id.*) The next month, when Daniels saw Dr. Kluznik, his medications had been changed to Remeron and Geodon, but he only took one dose of Geodon. (Tr. 326.) Daniels said voices were telling him to jump out a window. (*Id.*) Dr. Kluznik increased the dose of Remeron and started Thorazine, diagnosing major depression with psychosis. (*Id.*)

In August 2006, Daniels told Penton that he liked going to therapy group. (Tr. 325.) His mood was euthymic[4] and hopeful, as he waited for his GED results. (*Id.*) His speech and thoughts were appropriate, and anxiety assessment was negative. (*Id.*) At the end of October 2005, Daniels had received his GED, started computer classes, but was still short-tempered and irritable. (Tr. 324.) His thoughts of suicide were reduced to once or twice a week. (*Id.*) His mental status was normal except for mildly depressed mood. (*Id.*) Dr. Sovereign assessed a GAF score between 51-60.[5] (*Id.*)

The following month, Daniels asked Penton for a medication change for depression. (Tr. 323.) Daniels presented as low functioning and agitated, oriented but with slow, loud and pressured

[4] Euthymic means relating to euthymia, meaning either mental peace and tranquility or moderation of mood, not manic or depressed. *Stedman's Medical Dictionary* 626 (27th ed. 2000).

[5] GAF scores between 51-60 indicate moderate symptoms or moderate difficulty in social, occupational or school functioning. *DSM-IV-tr* at 34.

speech, no thought disorder or suicidal ideation, and antisocial traits. (*Id.*) Penton assessed a GAF score of 55. (*Id.*) Dr. Klunik increased Thorazine and discontinued Prozac. (*Id.* at 320.) On January 19, 2006, Dr. Dana Houck saw Daniels in response to a letter complaining that a staff person was "pushing his buttons." (Tr. 322.) On examination, Daniels was oriented but angry. (*Id.*) His speech and thought processes were normal. (*Id.*) He reported no suicidal ideation, and there was no evidence of hallucinations. (*Id.*) Dr. Houck assessed a GAF score between 50-55. (*Id.*)

Three months later, Daniels wrote a letter saying that AOD treatment[6] was causing his depression to increase. (Tr. 321.) He wept in the interview, but otherwise his mental status was normal. (*Id.*) Dr. Houck noted Daniels was dealing with poor self esteem, feelings of injustice and personality issues with staff. (*Id.*) He assessed a GAF score between 50-55. (*Id.*)

Daniels' next mental health assessment, in February 2007, was initiated by the Hearings and Release Unit and performed by Dr. Collette Morse and licensed psychologist Frank Barr at MCF-Lino Lakes. (Tr. 359-62.) Daniels had been released from prison in June 2006. (Tr. 359.) He was living with his girlfriend and occasionally working for an uncle. (*Id.*) After he had a fight with his girlfriend, he went to Chicago, violating his supervised release by failing to contact his agent and stay in Minnesota. (*Id.*) Dr. Morse noted Daniels had previously threatened to kill himself in prison. (Tr. 360.) He now admitted that he was not suicidal, just desperate to get away from his cellmate. (*Id.*) He was never sober for more than 86 days for the past ten years before prison. (*Id.*)

Daniels took the MMPI-2 personality test, and the scores were invalid, with predictive scales suggesting malingering or exaggeration. (*Id.*) On mental status examination, Daniels' mood was

_____

[6] AOD (Alcohol and Other Drug) treatment is a Minnesota Prison-based chemical dependency treatment. *Program Profile*, available at http://www.crimesolutions.gov/ProgramDetails.aspx?ID=150

dysthymic but he was otherwise normal, with low average intellectual ability. (*Id.*) Dr. Morse diagnosed cocaine dependence; cannabis dependence; depressive disorder, NOS; malingering (provisional); antisocial personality disorder; and she assessed a GAF score of 70.[7] (Tr. 361.) She opined that Daniels was mildly depressed; and he had threatened suicide as a means of improving his circumstances. (*Id.*) His hallucinations were better explained as violent fantasies. (*Id.*) Dr. Morse recommended participation in AA and a reentry group. (*Id.*)

Daniels was admitted to Regions hospital for a week on October 24, 2007. (Tr. 409.) He was brought in by police when he threatened to stab himself. (Tr. 412.) It was near the anniversary of his mother's and brother's deaths. (Tr. 417.) His cocaine and other substance use had increased since release from prison. (*Id.*) Upon admission, he was assessed a GAF score of 25,[8] and started on Wellbutrin and Seroquel. (Tr. 418.) Daniels denied a history of manic symptoms. (Tr. 417.) He had been living with his girlfriend and sister, and could not find work, likely due to his felony record. (Tr. 418.) Daniels had four children and owed child support for three children from a previous marriage. (*Id.*) He told a social worker that he only worked for one month while in prison between 2004 and 2006, but "otherwise quit his job out of frustration that 65% of income went to child support." (Tr. 423.) Dr. Harris and psychologist John Kelroy diagnosed severe major depressive disorder, episodic cocaine dependence, cannabis dependence, continuous alcohol abuse, antisocial personality traits, probable sleep apnea, and assessed a GAF score of 60. (*Id.*) On

[7] GAF scores between 61 and 70 indicate some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, with some meaningful relationships. *DSM-IV-tr* at 34.

[8] GAF scores between 21 and 30 indicate behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. *DSM-IV-tr* at 34.

discharge, Daniels was authorized for mental illness/chemical dependency treatment. (Tr. 412.)

On November 26, 2007, Daniels completed an assessment for counseling. (Tr. 487.) On mental status examination, his affect was appropriate, mood was level, he was oriented, denied manic symptoms, concentration was appropriate, and he denied suicidal ideation. (*Id.*) Daniels began counseling with Patricia Koregh in December 2007. (Tr. 492.) He had been sober thirty days and was attending AA twice a week. (*Id.*) He denied symptoms of depression. (*Id.*) The same day, Daniels saw Dr. Roger Johnson at St. Anthony Mental Health Clinic. (Tr. 504.) Daniels said he was depressed off and on, suffered insomnia, and he was irritable and anxious, with difficulty concentrating at times. (*Id.*) Dr. Johnson diagnosed major depressive disorder and prescribed Lamictal. (*Id.*) A few weeks later, Dr. Johnson noted Daniels had improved and was essentially euthymic and sober. (Tr. 503.)

Daniels was admitted to Regions Hospital again on January 18, 2008, for suicidal ideation and increased cocaine use. (Tr. 374-75.) He denied anxiety or PTSD symptoms. (Tr. 382.) During his mental status examination upon admission, he was mildly dysphoric but attention and processing were intact, and speech and thought content were normal. (Tr. 318.) Dr. Suzanne Harris stated, "[h]e had been noncompliant with outpatient treatment in terms of medication and recognizes that his mood has declined as a consequence." (*Id.*)

Upon discharge the next week, Dr. Harris noted Daniels was reluctant about leaving the hospital, and was manipulative about suicidal ideation, telling one person he was suicidal and another that he was not. (Tr. 374.) She noted he had limited coping skills and social support, and felt comfortable in the hospital. (*Id.*) His mood improved. (*Id.*) Dr. Harris diagnosed cocaine induced depression, history of major depressive disorder, cocaine dependence, cannabis dependence,

alcohol abuse, and antisocial personality traits. (Tr. 375.) Daniels was discharged for chemical dependency treatment and "sober" lodging. (*Id.*)

On March 15, 2008, Dr. Johnson noted Daniels had used cocaine again on February 1, went to jail, and was transferred to a hospital due to depression. (Tr. 498.) He had now been sober for five weeks. (Tr. 498.) Dr. Johnson increased his medication. (*Id.*) A month later, Daniels had improved a little but still had some mild mixed affective symptoms, and no side effects from medication. (Tr. 804.)

Daniels went to Regions Hospital again on May 1, 2008, after telling a police officer he was off his medications and wanted to jump in front of a vehicle. (Tr. 603.) Daniels told Dr. Scott Oakman that he had not taken his medications for a month because they were not helping, but Daniels' fiancé said he had been doing better on medications. (*Id.*) Daniels had used all of his money to buy cocaine and marijuana, and then sold his fiance's stereo for drug money. (*Id.*) He was afraid his fiancé would leave him, which prompted his suicidal behavior. (*Id.*) Daniels also told the admitting physician, Dr. Mary Carr, that he had not been honest with his psychiatrist about his drug use. (Tr. 625.) Dr. Oakman noted Dr. Johnson had diagnosed bipolar disorder, but Daniels was vague about his manic episodes. (Tr. 603.) Upon discharge, Daniels' cognition was intact; he denied suicidal and homicidal ideation; he exhibited normal thought processes and denied hallucinations; and his mood was good. (Tr. 601.) Daniels was accepted for CD treatment upon discharge. (Tr. 602.) His discharge diagnoses were substance induced mood disorder, history of bipolar affective disorder, history of major depression, cocaine and marijuana dependence, sleep apnea, obesity, and a GAF score of 55. (Tr. 601.) When Daniels saw Dr. Johnson on May 23, 2008, he had some mild, mixed affective symptoms, and Dr. Johnson increased his medications. (Tr. 579.)

Dr. Thomas Kuhlmann reviewed Daniel's social security disability file on May 27, 2008, at the request of the SSA. (Tr. 552-54.) He opined that Daniels' subjective complaints were only partially credible; and Daniels could concentrate on, understand, remember and carry out routine, repetitive 3-4 uncomplicated instructions and tasks with adequate persistence and pace; he could handle brief and superficial contact with coworkers and the public; he could handle ordinary levels of supervision found in a customary work setting; and he could handle routine stress of a routine repetitive work setting. (*Id.*)

One month later, Dr. Johnson noted Daniels still had symptoms, primarily insomnia. (Tr. 579.) He prescribed Remeron and completed a state agency medical opinion form for Daniels. (Tr. 579, 813.) Dr. Johnson indicated on the disability form that Daniels had bipolar affective disorder with concentration and memory difficulties, learning disability, indecision, anxiety, irritability, and psychomotor slowing. (Tr. 813.) He indicated that Daniels was chemically dependent, but if he stopped the addictive behavior, he would remain disabled. (*Id.*) On July 8, 2008, Dr. Johnson wrote a note stating Daniels had bipolar affective disorder, and the symptoms made it impossible for him to hold employment. (Tr. 578.)

Daniels was brought back to Regions Hospital by police on August 2, 2008, after saying he wanted to hang himself. (Tr. 583.) He had been sober for a while after his last CD treatment but starting using again, and his girlfriend kicked him out. (*Id.*) He had not been taking his psychiatric medications. (*Id.*) Daniels said he may have had some manic symptoms recently but he denied psychotic symptoms. (*Id.*) He endorsed memory and concentration problems, but attention and recent memory were intact on mental status examination. (Tr. 592, 594.) In a social work assessment, Daniels denied suicidal ideation and did not appear depressed. (Tr. 588.) He wanted

long term CD treatment. (Tr. 588.) However, in a psychiatric assessment the same day, Daniels said he felt manic the prior week and could not sleep or stop cleaning. (Tr. 591.) He was very tearful and said he had no reason to live. (*Id.*) Over the course of hospitalization, he was stabilized on medications. (Tr. 583.) Daniels was discharged to Hovander[9] pending further CD treatment. (*Id.*) His discharge diagnoses on August 11, 2008, were major depressive disorder without psychosis, cocaine and cannabis dependence, obesity, sleep apnea, and a GAF score of 45. (*Id.*)

Dr. Johnson increased Daniels' medications on August 26, 2008, noting he still had depressive and manic symptoms after his release from CD treatment. (Tr. 802.) He adjusted Daniels' medications again the next month because he continued to have insomnia and other symptoms of mixed affective disorder. (*Id.*) On October 22, 2008, Dr. Johnson noted doxepin had really helped Daniels, who was no longer manic but had mild depressive symptoms. (Tr. 801.)

Dr. Johnson completed a Psychological Impairment Questionnaire on Daniel's behalf on November 10, 2008. (Tr. 793-800.) He diagnosed Daniels with bipolar affective disorder, dependent personality disorder, obesity, and assessed a GAF score of 54. (Tr. 793.) He indicated that Daniels would be markedly limited in the following activities: understanding, remembering and carrying out detailed instructions; maintaining attention and concentration; performing activities within a schedule, maintaining regular attendance and being punctual; sustaining a routine without special supervision; completing a normal workday and workweek without interruption from symptoms and performing at a consistent pace without an unreasonable number and length of breaks. (Tr. 796-98.) Daniels would also be moderately limited in the following activities:

_____

[9] Hovander House is a mental health facility of Regions Hospital that provides short-term residence for patients after being hospitalized for mental illness. *Regions Hospital Opens Mental Health Facility*, Minneapolis/St. Paul Business Journal, Oct. 14, 2003, available at http://www.bizjournals.com/twincities/stories/2003/10/13/daily19.html

remembering locations and work-like procedures; understanding, remembering and carrying out one or two step instructions; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism from supervisors; and getting along with coworkers or peers. (*Id.*) Dr. Johnson indicated that Daniels did not suffer side effects from medications and did not have a low IQ. (Tr. 798-99.) He was capable of tolerating low work stress but would miss work more than three days per month. (Tr. 799-800.) Dr. Johnson's opinion applied beginning in mid-2006 . (Tr. 800.) When Daniels saw Dr. Johnson several weeks later, his mood was euthymic. (Tr. 810.)

On December 8, 2008, Daniels was assessed by Social Worker Michael Graff. (Tr. 822-24.) Daniels' mood was mildly depressed. (*Id.*) He sometimes heard voices telling him to hurt himself or others; however, he denied hallucinations. (*Id.*) Daniels was on probation. (Tr. 823.) His hobby was watching television. (*Id.*) He did not have a driver's license and owed child support. (*Id.*) Graff diagnosed polysubstance dependence, bipolar affective disorder, assessed a GAF score of 48, and recommended therapy. (*Id.* at 824.) Four days later, Dr. Johnson wrote a letter stating Daniels was disabled without consideration of his drug or alcohol abuse. (Tr. 807.)

Daniels' next visit with Dr. Johnson was on January 20, 2009. (Tr. 810.) Daniels said he was "pretty sober" and not depressed. (*Id.*) When he saw Graff that same day, he said he had been doing well. (Tr. 858.) On February 3, 2009, Dr. Johnson found Daniels was difficult to evaluate because his only activity was watching television. (Tr. 811.) He had mild, off and on depressive symptoms. (*Id.*) On the same day, Daniels told Graff he was feeling better, with minimal depressive symptoms. (Tr. 857-58.) A couple weeks later, Daniels told Graff his depression was worse, and he had no motivation to cook or clean. (Tr. 856-57.) He watched television all day. (*Id.*)

Daniels called 9-1-1 for depression and suicidal ideation on March 19, 2009. (Tr. 867.) He was taken to Regions Hospital, and he admitted to cocaine and cannabis use, but denied alcohol use despite elevated liver enzymes. (*Id.*) He complained of multiple stressors with his girlfriend and her children. (*Id.*) Daniels agreed to CD evaluation. (*Id.*) Upon discharge on March 24, 2009, his diagnoses were bipolar disorder, NOS; cocaine dependence; cannabis dependence; alcohol dependence; antisocial traits; obesity; sleep apnea; and a GAF score between 45-50. (Tr. 868.) Daniels expected to qualify for residency at Arrigoni House. (*Id.*)

Daniels saw Dr. Johnson and his counselor on April 14, 2009. (Tr. 815, 855.) Dr. Johnson noted Daniels had more depressive symptoms, and that he might be using, but Daniels denied it. (Tr. 815.) Dr. Johnson diagnosed dependent personality type, noting Daniels did not take responsibility for himself. (*Id.*) Graff noted Daniels did not like Arrigoni House and had not wanted to leave the hospital because he was still depressed. (Tr. 855.) Several weeks later, Dr. Johnson found Daniels difficult to evaluate because he used dejection to get sympathy. (Tr. 815.) Graff noted Daniels was irritable but said he had not relapsed. (Tr. 855.)

On April 14, 2009, Dr. Johnson completed a Ramsey County Rule 79 Statement of Need form on Daniels' behalf. (Tr. 848-53.) He indicated that Daniels was seriously and persistently mentally ill with bipolar disorder, polysubstance dependence, and antisocial personality disorder. (Tr. 850.) He assessed a GAF score of 46. (*Id.*) Daniels said he felt worse when not using. (Tr. 852.) In Daniels' visits with Dr. Johnson and Graff in early May 2009, they found him to be doing better. (Tr. 816, 846.) On May 26, 2009, Graff noted that Daniels endorsed four out of nine criteria for major depressive disorder. (Tr. 841-42.) Graff stated, "[h]e still looks for 'cracks in the system' to get away with stuff." (Tr. 842.) In June, Daniels said he had not relapsed, and he could not wait

to get out of the sober house where he lived, but he had nowhere to go.  (Tr. 839.)

In July 2009, Daniels had moved in with his girlfriend and was keeping house.  (Tr. 837.)
Dr. Johnson noted Daniels was close to euthymic but with some insomnia and mild depression.  (Tr.
817.)  He prescribed mirtazapine.  (*Id.*)  In August, he was still partially depressed and had never
started mirtazapine.  (*Id.*)  In September 2009, Daniels was euthymic and sober, with no medication
side effects.  (*Id.*)  The next month, Daniels had some depressive symptoms related to his situation
but felt much better after he moved into his own place.  (Tr. 862, 830.)  In the next months, Daniels
had relationship problems and difficulty sleeping.  (Tr. 827-30.)

In January and February 2010, Johnson remained sober and was getting along "okay."  (Tr.
862, 871.)  On February 22, 2010, Dr. Johnson wrote a "Whom it May Concern letter" on Daniels'
behalf.  (Tr. 865.)  Dr. Johnson referred to the November 2008 questionnaire he completed for
Daniels.  (*Id.*)  He noted that Daniels still had depressive symptoms and needed adjustment of
medications in August 2009.  (*Id.*)  In September, Daniels was adjusting to medication side effects,
and due to lack of significant progress, he was still disabled from full-time competitive employment.
(*Id.*)  However, in March 2010, Daniels was "mostly euthymic" or had only mild symptoms.  (Tr.
870.)

After the March 2010 administrative hearing on Daniels' social security disability claim, he
underwent a neuropsychological evaluation in May 2011, and submitted the report to the Appeals
Council.  (Tr. 9-17.)  Daniels was referred to Dr. Thomas Misukanis for evaluation based on
chemical dependency, bipolar disorder, history of closed head injuries, PTSD, and complaints of
decline in memory over the last few years.  (Tr. 9.)  Dr. Misukanis opined that the most compelling
findings from the evaluation were the MMPI-2 personality test results.  (*Id.*)  The results were likely

valid but there was indication of possible symptom magnification.  (*Id.*)  The tests results suggested prominent depression in someone with a history of reckless and antisocial behavior.  (*Id.*)  Such individuals tend to present for help after getting in trouble with the law or in a situation where they lack an easy exit.  (*Id.*)

Daniels' full scale IQ score was 79, in the borderline to low average range.  (Tr. 10.) Daniels generally scored in the low average range on all measures.  (*Id.*)  In sum, there was a very mild attentional and processing difficulty in a person with prominent psychiatric and personality issues.  (*Id.*)  Dr. Misukanis found Daniels to meet the criteria for  bipolar disorder, PTSD, and cannabis and cocaine dependence.  (*Id.*)  He opined that Daniels needed to remain in counseling and stay on bipolar medications to avoid a manic episode leading to substance abuse.  (*Id.*)  He opined that Daniels had a low average cognitive ability; his  memory was generally sound but it was difficult for him to acquire new information; and he would benefit from reminders using a calendar. (*Id.*)  When Daniels was sober and his emotions were stable, his reasoning, problem solving and memory were relatively sound.  (*Id.*)

### C.    The Administrative Hearing

At the hearing before the ALJ on March 25, 2010, Daniels testified as follows.  He was born on July 21, 1969, weighed about 270 pounds and was 5' 8 ½ inches tall.  (Tr. 54.)  He was not married but had four children.    (*Id.*)  His driver's license was suspended for not paying child support.  (Tr. 55-56.)    Daniels earned his GED in prison.  (Tr. 56.)  He last worked part-time as a prep cook in 2006.  (Tr. 56-57.)  Daniels did not think he could work a full-time job due to poor sleep and depression.  (Tr. 57.)  He spent his days watching television.  (*Id.*)  He made himself sandwiches and took the garbage out.  (*Id.*)  He did not go shopping.  (*Id.* at 57-58.)  He had one

14

friend whom he talked to daily. (Tr. 58.)

Daniels was sober from drugs and alcohol for 375 days as of that day, although with a one-day marijuana relapse. (Tr. 59.) He felt alone and depressed because most of his relatives had died. (*Id.*) His appetite was up and down, and he had gained about 75 pounds since 2004. (Tr. 59-60.) Daniels was easily irritated, making it difficult to be around people. (Tr. 60.) He did not see how he could work with people for an eight-hour day. (Tr. 70-71.) On a bad day, he felt alone and thought about his mother's and brother's death, and his other brother's imprisonment. (Tr. 60-61.) If he did not have to go somewhere, he did not bother getting dressed. (Tr. 61.) He did not have medication side effects and no longer heard voices. (*Id.*) On most days, he fell asleep watching television. (Tr. 62.)

Dr. Mary Louise Stevens[10] testified at the hearing as a medical expert. (Tr. 62.) She testified that without considering the use of drugs and alcohol, Daniels would have mild to moderate symptoms of depression, when medication compliant and sober. (Tr. 64-65.) With the use of drugs and alcohol, Daniels had marked limitations in activities of daily living, marked social difficulties, and marked difficulties in concentration, persistence or pace, with four or more episodes of decompensation. (Tr. 65.) Daniels would meet listing 12.09 with consideration of drugs and alcohol, but would not meet a listing without consideration of drugs or alcohol. (*Id.*) Without the use of drugs or alcohol, he could perform simple, unskilled work, limited to brief and superficial contact with others in an environment free from all controlled substances. (*Id.* at 65-66.)

Dr. Stevens disagreed with Dr. Johnson's opinion because in his October 22, 2008 treatment note, he said Daniels was no longer manic and had mild depressive features. (Tr. 66.) The next

---

[10] The Court uses the spelling of the medical expert's name used by the ALJ in the hearing decision. (Tr. 37.)

month he was euthymic.  (*Id.*)  This was when he was sober.  (*Id.*)  Daniels said he was "pretty sober" in January 2009, suggesting he was using again.  (*Id.*)  This was a pattern for him.  (*Id.*)  Dr. Stevens saw a pattern of chemical dependency relapse, hospitalization, chemical dependency treatment, restarting psychiatric medications, and relapsing again, continually from 2004 to the present.  (Tr. 63-64.)

Jesse Ogren then testified as a vocational expert.  (Tr. 67.)  He testified that a person could not perform Daniels' past relevant work given the following assumptions:  a person of the claimant's age, education and work experience who is impaired by major depression, bipolar disorder, personality disorder and capable of work at any exertional level, limited to work with routine, repetitive instructions and routine, repetitive, unskilled work; brief and superficial contact with coworkers and the public; ordinary levels of supervision; routine stress of a routine, repetitive work setting; and environment free of drugs and alcohol.  (Tr. 67-68.)  Such a person, however, could perform jobs such as laundry worker,[11] [sealing] machine operator,[12] and deburrer.[13]  (Tr. 68.)  If the individual could not maintain the persistence and pace necessary for competitive employment, Ogren testified he could not perform these jobs.  (Tr. 68.)  The typical tolerance for absences in these jobs is no more than two days per month.  (Tr. 69.)  The only breaks that would be tolerated were five to ten minute breaks outside the lunch period.  (*Id.*)

### D.    The ALJ's Decision

On June 18, 2010, the ALJ issued his decision denying Daniels' applications for DIB and

---

[11] Dictionary of Occupational Titles ("DOT") Code 361.684-014, with 3,500 jobs in Minnesota.

[12] The hearing transcriber misspelled "sealing" as "ceiling."  DOT 920.685-074, with 8,000 jobs in Minnesota.

[13] DOT 676.686-014, with 3,000 jobs in Minnesota.

SSI.  (Tr. 26-42.)  The ALJ followed the five-step sequential evaluation set forth in the agency's regulations.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity ("RFC") to perform his or her relevant past work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work, then the burden is on the ALJ "to prove that there are other jobs in the national economy that the claimant can perform."  Fines v. Apfel, 149 F.3d 893, 894-95 (8th Cir. 1998).

At the first step of the evaluation process, the ALJ determined that Daniels had not engaged in substantial gainful activity since October 10, 2004, the alleged onset date.  (Tr. 32.)  At the second step of the process, the ALJ found that Daniels had severe impairments of sleep apnea, obesity, depression, personality disorder, and substance addiction disorder.  (*Id.*)

At the third step of the evaluation, the ALJ determined that Daniels' impairments, including substance use disorders, met Listings 12.04 (affective disorders), 12.08 (personality disorders), and 12.09 (substance use disorders) of 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)  The ALJ relied on the testimony of the medical expert, Dr. Mary Stevens.  (Tr. 37-38.)  When using substances, Daniels had marked limitations and four episodes of decompensation.  (Tr. 37.)  If Daniels stopped his substance use, he would continue to have a severe impairment or combination of impairments, but those impairments would not meet or medically equal a listed impairment in 20 C.F.R. Part 404,

Subpart P, Appendix 1. (Tr. 38.) Daniels' remaining mental limitations, in terms of the "paragraph B" criteria of the mental health listed impairments, would cause only mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (*Id.*)[14]

At the next step of the evaluation process, the ALJ determined that if Daniels stopped his substance use, he would have the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:

> [T]he claimant has the capacity to concentrate, understand, and remember simple, routine, repetitive instructions; carry out routine, repetitive tasks in unskilled work; interact and get along with coworkers and the public on a brief, superficial basis, can function with ordinary levels of supervision; and tolerate routine stress of a routine, repetitive work setting in an environment free of alcohol and drugs.

(Tr. 39.)

The ALJ gave the following reasons for his conclusion. Absent substance use, the record showed Daniels did not generally receive the type of treatment "one would expect for a totally disabled person." (Tr. 40.) First, when Daniels was sober and compliant with treatment, treatment was generally successful in controlling his symptoms. (*Id.*) However, Daniels continued to relapse until 2009, and his symptoms worsened with relapse. (*Id.*) Second, medications were effective in controlling Daniels' mental symptoms, and Daniels did not allege side effects from medication.

Third, the ALJ found Daniels' subjective complaints were not credible. (*Id.*) Treating

---

[14] The ALJ explained that the limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment, and are only intended to assess severity of impairments at steps two and three of the sequential disability evaluation. (Tr. 39) A more detailed RFC assessment is done at step four of the evaluation. (*Id.*)

psychologists at the Minnesota Department of Corrections suggested Daniels was malingering or misrepresenting himself. (*Id.*) Furthermore, Daniels' responses during psychological testing resulted in an invalid profile, suggesting he was not fully cooperating. (*Id.*) Other records, "contain clear evidence that the claimant has consciously attempted to portray limitations that are not actually present to improve his circumstances." (*Id.*) Fourth, Daniels' work history indicates only sporadic work, raising the question whether his unemployment is actually due to medical impairments. (*Id.*)

The ALJ found inconsistencies with Daniels' subjective complaints. Daniels was not always compliant with medications, but when compliant his symptoms were controlled. (*Id.*) Various treating sources found Daniels to be "a bit manipulative" when providing information relevant to the issue of disability. (*Id.*) Finally, Daniels' daily activities of watching television, reading, making salads, and taking out the garbage were "not limited to the extent one would expect." (*Id.*) However, the ALJ concluded Daniels would be unable to perform his past relevant work as a cook, if he stopped the substance use. (Tr. 40.)

The ALJ also rejected Dr. Johnson's opinion that drug or alcohol addiction was not material to Daniels' disability. (Tr. 38.) He found that Daniels' depressive symptoms were well controlled when Daniels was sober and in treatment with Dr. Johnson. (*Id.*) However, Daniels continued to relapse through 2009, and then his symptoms worsened. (*Id.*) During Daniels' periods of sobriety, Dr. Johnson's records did not "reveal the type of significant clinical abnormalities one would expect" if substance use was not a contributing factor to disability, and Dr. Johnson did not explain this. (*Id.*)

The ALJ gave great weight to the medical expert's and DDS consultants' opinions that without drug or alcohol use, Daniels had mild to moderate symptoms of depression. (*Id.*) And,

when Daniels was medication compliant, he had mild restriction in activities of daily living, and moderate difficulties in social functioning and in concentration, persistence or pace. (*Id.*)

Based on the Medical-Vocational Rules and vocational expert testimony, the ALJ concluded that if Daniels stopped his substance use, there would be a significant number of jobs in the national economy that Daniels could perform, including laundry worker, sealing-machine operator, and deburrer. (Tr. 41.) Because Daniels would not be disabled if he stopped his substance use, his substance use was a contributing factor material to the determination of disability. (Tr. 42.) Therefore, Daniels was not disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of the decision. (*Id.*)

## II.     STANDARD OF REVIEW

Review by this Court is limited to a determination of whether a decision of the ALJ is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Davidson v. Astrue*, 578 F.3d 838, 841 (8th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brace v. Astrue*, 578 F.3d 882, 884 (8th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted)). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Id*.

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite

conclusion.  *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (if supported by substantial evidence, the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.)  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  *Gavin*, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability benefits.  *See* 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated he or she can not perform past work due to a disability, the burden of proof shifts to the Commissioner to show that the claimant can engage in some other substantial gainful activity.  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

If drug or alcohol abuse is a contributing factor material to the determination of disability, the application for social security disability must be denied.  *Brueggemann v. Barnhart*, 348 F.3d 689, 693 (8th Cir. 2003) (citing 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. § 404.1535).  The burden of proof that drug or alcohol abuse is not a contributing factor material to disability falls on the claimant.  *Id.*  However, the ALJ must award benefits if the ALJ is unable to determine whether substance use disorders are a contributing factor to the disability determination.  *Id.*

The ALJ must follow a specific procedure in cases involving drug and or alcohol abuse.  *Id.* at 694.  First, the ALJ must base his disability determination on the claimant's medical limitations, without excluding the assumed effects of substance use disorders.  *Id.*  If the gross total of the claimant's limitations suffices to show disability, then the ALJ should consider which limitations would remain if the effects of substance use disorders were absent.  *Id.* at 694-95.  If the claimant is actively abusing alcohol or drugs, the determination will necessarily by hypothetical.  *Id.* at 695.

**III.  DISCUSSION**

Daniels makes four arguments in support of his motion for summary judgment. First, he asserts the ALJ erred by relying solely on the opinions of non-examining consultants on the issue of whether drug and/or alcohol abuse is material to disability. Second, Daniels contends the ALJ failed to follow the treating physician rule. Third, Daniels argues the ALJ failed to do a proper credibility analysis. Fourth, Daniels asserts that the ALJ relied upon flawed vocational expert testimony in finding there is work he could perform.

### A.   RFC Determination

#### 1.   Medical Opinions

An ALJ can discount a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Id.* at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)). The ALJ was not required to give controlling weight or greater weight than he did to Dr. Johnson's opinions because Dr. Johnson's opinions were inconsistent with his own treatment notes and other substantial evidence in the record. Contrary to his opinion of disability absent the effects of substance abuse, Dr. Johnson's treatment notes indicate that when Daniels became sober after his relapses, his symptoms were mild or even absent.

For example, when Daniels was sober for thirty days as of December 7, 2007, he denied symptoms of depression to his counselor. (Tr. 492.) The same day, he told Dr. Johnson he was depressed off and on, with difficulty concentrating at times. (Tr. 504.) Dr. Johnson prescribed Lamictal, and a few weeks later, Daniels was sober and euthymic. ( Tr. 503.) A couple months after Daniels' February 2008 relapse, Dr. Johnson noted Daniels had some mild mixed affective

symptoms. (Tr. 804.) Daniels also had only mild symptoms several weeks after his May 2008 relapse. (Tr. 579.) After Daniels August 2008 relapse, Dr. Johnson stabilized Daniels on medication, and in October 2008, Daniels had only mild depressive symptoms. (Tr. 801.) Several weeks after Dr. Johnson completed the November 2008 questionnaire opining that Daniels was disabled, Dr. Johnson noted Daniels was euthymic. (Tr. 810.) Daniels had mild symptoms or was euthymic in January and February 2009, and again in May 2009, after relapsing in March 2009. (Tr. 810-11, 816-817.)

There is other evidence in the record that is inconsistent with Dr. Johnson's opinion that Daniels would have marked limitations in maintaining attention and concentration. Although Daniels complained of difficulty concentrating, in mental status examinations, his attention, concentration and memory were intact. (Tr. 592, 594, 487, 601, 321, 324.) Daniels submitted a neuropsychological report to the Appeals Council after the ALJ issued his decision. Daniels' neuropsychological evaluation suggested "a very mild attentional and processing difficulty." (Tr. 10.)

Daniels contends the ALJ erred by failing to cite any medical opinion in support of his RFC finding, but the ALJ stated that he placed great weight on the medical expert's and state agency consultants' opinions.[15] (Tr. 38.) Furthermore, the ALJ did not rely solely on nonexamining

---

[15] The Court notes the Eighth Circuit has questioned whether the ability to work in the absence of alcoholism is a "medical question" comparable to the traditional determination of residual functional capacity. *Vester v. Barnhart*, 416 F.3d 886, 890 (8th Cir. 2005). The court explained:

> Put simply, if an ALJ is presented with evidence that a claimant has demonstrated the ability to work during periods of sobriety, it seems within the ken of the ALJ to make a factual finding that the claimant is able to work when she is not abusing alcohol. This sort of judgment, based largely on historical facts, strikes us as different in kind from that required when a claimant presents a set of medical

physicians' or psychologists' opinions, he reviewed all evidence in the record, gave reasons for rejecting Dr. Johnson's opinions, and performed a thorough credibility analysis. *See Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007) ("It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." (quoting *Harris v. Barnhart*, 356 F.3d 926, 931 (8th Cir. 2004)). The evidence in the record as a whole is consistent with the medical expert's testimony, credited by the ALJ, that Daniels had a pattern of chemical dependency relapse, hospitalization, chemical dependency treatment, restarting psychiatric medications, and relapsing again. (Tr. 63-64.) Under such circumstances, the ALJ did not substitute his own opinion for a treating physician's opinion, and substantial evidence supported the ALJ's conclusion that drug and/or alcohol abuse was a contributing factor material to disability. *Vester v. Barnhart*, 416 F.3d 886, 890 (8th Cir. 2005). Therefore, the ALJ properly weighed the medical opinions and determined drug addiction or alcoholism was a contributing factor material to disability. *See also Chesney v. Astrue*, Civil No. 3:11-cv-03098, 2012 WL 5283196, at *6 (W.D.Ark. Sept. 26, 20102) ("consistent with *Vester*, the ALJ was not required to provide any medical evidence specifically outlining Plaintiff's different limitations with and without his substance use.")

### 2.    Credibility

Analyzing the credibility of the claimant's subjective complaints is a component of the RFC determination. *Ellis v. Barnhart*, 392 F.3d 988, 995-96 (8th Cir. 2005). The ALJ may not discount

---

problems, and the ALJ must make a predictive judgment as to the claimant's ability to work in light of a given medical condition.

*Id.* at 891.

a claimant's credibility solely because the objective evidence does not fully support his subjective complaints, but may discount credibility based on inconsistencies in the record as a whole. *Ellis*, 392 F.3d at 996. The ALJ should consider the claimant's prior work record, and observations by third parties and treating and examining physicians regarding the claimant's: 1) daily activities; 2) duration, frequency and intensity of subjective symptoms; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The court should not disturb the ALJ's credibility finding if the ALJ provided good reasons supported by substantial evidence for finding the claimant not credible. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

Contrary to Daniels' assertion, although the ALJ's credibility analysis contains some boilerplate language, it is clear that the ALJ considered all of the evidence in the record in assessing Daniels' credibility and determining his RFC. "[A]n ALJ may discount a claimant's allegations if there is evidence that claimant was a malingerer or was exaggerating symptoms for financial gain." *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009) (quoting *O'Donnell v. Barnhart*, 318 F.3d 811, 818 (8th Cir. 2003). Daniels MMPI-2 test results in February 2007 suggested malingering or exaggeration of his symptoms. (Tr. 360.) Although his May 2011 MMPI-2 test results were likely valid, the results suggested symptom magnification. (Tr. 9.) Furthermore, the May 2011 tests results suggested a person who "tend[s] to present for help after getting in trouble with the law or in a situation where they lack an easy exit." (*Id.*) Importantly, Daniels admitted that he pretended to be suicidal in prison to get away from a cellmate he did not like. (Tr. 360.) And, Dr. Harris at Regions Hospital noted Daniels was manipulative about suicidal ideation, telling one person he was suicidal and another that he was not. (Tr. 374.) Even Dr. Johnson found Daniels difficult to evaluate because he "used dejection to get sympathy." (Tr. 815.) On one occasion, Daniels'

suicidal behavior was prompted by fear that his girlfriend would leave him after he sold her stereo to buy drugs. (Tr. 603.) On that occasion, Daniels told the admitting physician at the hospital he had not been honest with his psychiatrist about his drug use. (Tr. 625.) Daniels' manipulative behavior discredits his claim that his psychiatric symptoms while he was sober in prison are evidence that he is disabled by mental illness.

It was also proper for the ALJ to discount Daniels' credibility because there is substantial evidence in the record that he was noncompliant with his psychiatric medications at times, but when he was compliant, his symptoms improved. Noncompliance with treatment "can constitute evidence that is inconsistent with a treating physician's medical opinion," if the noncompliance was unjustified. *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010). Furthermore, impairments that are amenable to treatment do not support disability. *Davidson*, 578 F.3d at 846 (citing *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997). Daniels took his psychiatric medications inconsistently, often discontinuing when he was abusing cocaine and cannabis. (Tr. 817, 583.) In January 2008, Dr. Harris stated, "[h]e had been noncompliant with outpatient treatment in terms of medication and recognizes that his mood has declined as a consequence." (Tr. 318.) On one occasion, Daniels said he stopped his medication because it was not working, but his fiancé said he had been better while he was taking his medications. (Tr. 603.) Dr. Johnson noted Daniels' manic symptoms came under control with doxepin. (Tr. 801.) Daniels' depressive symptoms also improved with medication when he was sober. (Tr. 334, 374, 804, 503, 816, 846.) Thus, the record as a whole supports the ALJ's decision to discount Daniels' complaints of disabling mental impairments when he was sober.[16]

---

[16] This Court need not address the ALJ's other reasons for discrediting Daniels' subjective complaints. *See Wildman*, 596 F.3d at 966 (unnecessary to discuss all of ALJ's reasons to

**B.      Hypothetical Question to the Vocational Expert**

In order to rely on a vocational expert's testimony, an ALJ must include all of the claimant's impairments and concrete consequences of those impairments in a hypothetical vocational question. *Robson v. Astrue*, 526 F.3d 389, 392 (8th Cir. 2008).  Where the ALJ's RFC finding is supported by substantial evidence in the record as a whole and is included in the hypothetical question to the VE, as it was here, the ALJ may rely on the VE's vocational testimony.  *Goff v. Barnhart*, 421 F.3d 785, 794 (8th Cir. 2005).  Therefore, in this case, the ALJ did not need to include Dr. Johnson's opinion of Daniels' limitations.

However, Daniels also contends the ALJ erred by failing to include moderate limitations in social functioning and moderate limitations in concentration, persistence or pace in the hypothetical question, and that the Commissioner failed to address precedent on this issue, *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996).  In *Newton*, the court held the ALJ erred by not including in the hypothetical question the claimant's limitations in concentration, persistence or pace because the ALJ indicated on the Psychiatric Review and Technique Form that the claimant "often" had such deficiencies.  92 F.3d 688, 695 (8th Cir. 1996).  It was not sufficient that the ALJ limited Newton to simple jobs because on cross-examination, the VE testified that Newton's "concentration and persistence problems related to basic work habits needed to maintain employment."  (*Id.*)

*Newton* is distinguishable here because the ALJ did not find that Daniels "often" had deficiencies in concentration, persistence or pace, nor does the record support such a finding during periods of Daniels' sobriety.  In the ALJ's decision, the ALJ specified that his finding of moderate limitations in concentration, persistence or pace were not part of the RFC finding, but the finding

_____

discredit a physician's opinion).

related only to the analysis of whether Daniels met a listed impairment under the paragraph B criteria. *See supra* note 14. The ALJ added that he would make more specific RFC findings in the next step of the evaluation process, and the ALJ did so. (Tr. 39.) The ALJ then included his RFC finding in the hypothetical question posed to the vocational expert. Therefore, it was proper for the ALJ to rely on the vocational expert's testimony, and find Daniels was not disabled. *See Alvarez v. Astrue*, Civil Action No. 11-2512-JWL, 2012 WL 3441904 at *17-20 (D.Kansas Aug. 14, 2012) (distinguishing *Newton* where ALJ went beyond step three of the sequential evaluation process and made more specific RFC finding of the Plaintiff's mental impairments in accordance with Social Security Ruling 96-8p).

## III.    CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED THAT:**

1.    Plaintiff's Motion for Summary Judgment [Docket No. 7] be **DENIED**;

2.    Defendant's Motion for Summary Judgment [Docket No. 13] be **GRANTED;**

3.    If this Report and Recommendation is adopted, that judgment be entered accordingly.


Dated: February 6, 2013             ___*s/ Arthur J. Boylan*_____
                                    ARTHUR J. BOYLAN
                                    United States Chief Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.

This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before February 21, 2013.